**DONNELLY GARMENT CO. v. NATIONAL LABOR RELATIONS BOARD (DONNELLY GARMENT WORKERS' UNION et al., Interveners).**

No. 12641.

Circuit Court of Appeals, Eighth Circuit.

Oct. 29, 1945.

WOODROUGH, Circuit Judge, dissenting.

Robert J. Ingraham, of Kansas City, Mo. (Burr S. Stottle, of Kansas City, Mo., on the brief), for petitioner.

Frank E. Tyler, of Kansas City, Mo. (Gossett, Ellis, Dietrich & Tyler, of Kansas City, Mo., on the brief), for intervener, Donnelly Garment Workers' Union.

Ruth Weyand, Attorney, National Labor Relations Board, of Washington, D. C. (Alvin J. Rockwell, General Counsel, National Labor Relations Board, and Malcolm F. Halliday, Associate General Counsel, National Labor Relations Board, both of Washington, D. C., on the brief), for respondent.

Cliff Langsdale, of Kansas City, Mo., for intervener, International Ladies' Garment Workers' Union.

Before SANBORN, WOODROUGH, and RIDDICK, Circuit Judges.

SANBORN, Circuit Judge.

This is a petition of the Donnelly Garment Company to review and set aside an order of the National Labor Relations Board, entered June 9, 1943 (50 N.L.R.B. 241), requiring the disestablishment of the Donnelly Garment Workers' Union and the abrogation of its contracts with the petitioner. The Board, in its answer, has requested this Court to enforce the order.

The National Labor Relations Board, on April 27, 1939, upon charges filed by the International Ladies' Garment Workers' Union (hereinafter referred to as "the International"), issued a complaint, subsequently amended, against the Donnelly Garment Company, of Kansas City, Missouri, a manufacturer of women's garments, doing a nationwide business, charging it with having engaged in unfair labor practices within the meaning of Section 8(1), (2) and (3) and Section 2(6) and (7) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq.

Briefly stated, the charges were that the Company had fostered, dominated and supported the Donnelly Garment Workers' Union, an independent union of the Company's employees (which, for convenience, will be called the "plant union"), and its alleged predecessor, the "Nelly Don Loyalty League"; that the Company had entered

into a closed-shop agreement with the plant union for the purpose of assisting it; that the Company, in April, 1937, discriminatorily discharged, and had refused to reinstate, two employees, Sylvia Hull and May Fike, for joining and assisting the International.

In its answer, the Company denied that it had engaged in any unfair labor practices, and asserted the existence, on the part of the International, of a conspiracy to force the Company, by fraud, violence and secondary boycott, to compel its employees, against their will, to join the International, and that the Board, its agents and representatives were furthering this unlawful conspiracy.

The Donnelly Garment Workers' Union (the plant union) was permitted to intervene. It admitted in its answer that the Company and the plant union had entered into a closed-shop agreement, but denied all of the other allegations of the complaint.

The International was also permitted to intervene, in support of the charges against the Company.

Upon the issues made by the pleadings, a hearing was had in 1939 before a Trial Examiner appointed by the Board. He excluded evidence which the Company and the plant union deemed to be relevant and material, including proffered testimony of employees tending to show that the plant union was not dominated and supported by the Company, and evidence that the International was engaged in an unlawful conspiracy to force the Company to compel its employees to join the International against their will. The Trial Examiner, in his intermediate report, found the facts in favor of the Board, except as to the alleged discriminatory discharge of May Fike and as to the alleged discriminatory discharge and refusal to reinstate Sylvia Hull. He found that May Fike had not been discriminatorily discharged; and found that Sylvia Hull had been excluded from the plant of the Company because of union membership and activities, but was not discriminatorily discharged.

The Board's decision of March 6, 1940, sustained the rulings and adopted the recommendations of the Trial Examiner, except that the Board determined that May Fike had been discriminatorily discharged and was entitled to be compensated for her loss of wages. The Board ordered the Company to cease and desist from engaging in the unfair labor practices found to exist; to disestablish the plant union as the representative of its employees for purposes of collective bargaining; to cease and desist from giving effect to its contracts with the plant union, except "the substantive features * * * relating to rates of pay, wages, hours of employment, or other conditions of employment"; to reimburse the employees for amounts deducted from their wages as dues for the plant union; to reinstate May Fike and to reimburse her for any loss in wages.

The Company filed in this Court its petition for a review of the order of the Board. The Board answered the petition and asked that its order be enforced. The validity of the order was challenged by the Company upon two grounds: (1) lack of due process, and (2) lack of an adequate evidentiary basis for the order. This Court thought that the Board, by refusing to receive and to consider the proffered evidence of the employees of the Company indicating that their freedom of choice of a bargaining representative had been in no way interfered with and that the plant union was uninfluenced, undominated and unsupported by the Company, had clearly denied the Company and the plant union due process of law. See Donnelly Garment Co. v. National Labor Relations Board, 8 Cir., 123 F.2d 215. We expressed the opinion that bias and prejudice on the part of the Trial Examiner and the Board was not shown by the record; that the Trial Examiner had not erred in confining the issues to those tendered by the complaint; and that the Board was not required to try the International for an alleged conspiracy, nor to try the charge that the Board had conspired or colluded with the International. We concluded that there was a lack of due process in the proceedings before the Board in that competent and relevant evidence offered by the Company had been excluded. We said, in that connection (page 224 of 123 F.2d): "The truth is that a controversy tried before a court or before an administrative agency is not ripe for decision until all competent and material evidence proffered by the parties has been received and considered."

We also said (page 225 of 123 F.2d): "Our conclusion is that the petition of the Board for enforcement of the order under review must be denied. We think that the least that the Board can do, in order to cure the defects in its procedure caused by the

failure of the Trial Examiner to receive admissible evidence, is to vacate the order and the findings and conclusions upon which it is based; to accord to the petitioners [the Company and the plant union] an opportunity to introduce all of the competent and material evidence which was rejected by the Trial Examiner; and to receive and consider such evidence together with all other competent and material evidence in the record before making new findings and a new order."

The final paragraph of our opinion reads as follows (page 225 of 123 F.2d): "The petition of the Board for the enforcement of its order is denied, and the case is remanded to the Board for further proceedings."

The mandate of this Court provided that the case be "remanded to said Labor Board for further proceedings not inconsistent with the opinion of this Court." It is, we think, apparent that what this Court, in effect, ruled was that the Company and the plant union were entitled to a new trial upon the evidence already taken and such competent and material evidence as might be proffered upon a further hearing. We were advising the Board that, in our opinion, it had not complied with the minimal constitutional requirements of due process. Under the order of this Court, the Board was at liberty to do whatever was necessary in order to give to the parties the full and fair hearing to which they were constitutionally entitled. If the Board thought that this Court was wrong in its conclusion that the proceedings which preceded the Board's order were lacking in due process, the Board was, of course, at liberty to apply to the Supreme Court for certiorari. The Board entered an order setting aside its decision and order of March 6, 1940, and reopened the record for a further hearing "for the purpose of taking additional evi-

dence in accordance with said opinion and decree" of this Court.

The Board designated as the Trial Examiner to conduct the further hearing the same Trial Examiner who had presided at the original hearing and who, during that hearing, had expressed the opinion that evidence of employees of the Company which this Court ruled to be competent and material was immaterial and valueless. The Company presented to the Board a request that it designate another Trial Examiner to conduct the hearing. The basis for the request was that the examiner designated was biased and prejudiced. Attached to the request was an affidavit of prejudice signed by the Secretary of the Company, stating that he believed that the examiner had prejudged the evidence which this Court had held must be received and considered. The basis for the affiant's belief was stated in detail. It consisted of rulings and remarks of the examiner, made during the original hearing, relative to the admissibility and worth of evidence proffered by the Company and rejected. The intervener plant union concurred in the request for the designation of another Trial Examiner. The Board refused the request. It stated that this Court had decided "that the Trial Examiner and the Board had been free of any bias or prejudice." [1]

The further hearing was conducted by the Trial Examiner during the summer of 1942. He permitted Mrs. James A. Reed (Nell Quinlan Reed), the President of the Company (who had by reason of illness been unable to appear at the original hearing), to testify. He admitted the evidence of eleven of the employees of the Company tending to show that the employees voluntarily formed the plant union and that the union had at all times been free from employer influence, domination, and support. He then ruled that other similar employee

[1] This statement is based upon the following language in the opinion of this Court (123 F.2d 215, 219): "We think that it cannot be said that it appears from the record of the proceedings before the Examiner and before the Board that there was a denial of due process because of bias and prejudice or collusion. If, as petitioners [the Company and the plant union] contend, the Trial Examiner and the Board ruled erroneously with respect to the issues to be tried or in the exclusion of evidence and drew unwarranted inferences from the evidence adduced, that would not justify a conclusion that either the Examiner or the Board was prejudiced or deliberately unfair. That the Examiner made comments which might better have been omitted, with respect to the attitude of the petitioners' witnesses or the character of their testimony, is not enough to show a denial of due process. Compare Cupples Co. Manufacturers v. National Labor Relations Board, 8 Cir., 106 F.2d 100, 113; Goldstein v. United States, 8 Cir., 63 F.2d 609, 612–614."

testimony would be cumulative and refused to admit it. He rejected other offers of proof made by the Company and the plant union. He struck out so much of Mrs. Reed's testimony as related to events subsequent to July 15, 1939, the date of the termination of the first hearing. He received, as rebuttal, testimony offered by the Board tending to strengthen its case in chief, and allowed the Company and the plant union a limited surrebuttal.

The intermediate report of the Trial Examiner was filed November 27, 1942. It recites that he had accorded the Company and the plant union an opportunity to introduce all of the competent and material evidence which was rejected at the prior hearing, and that the report was based upon the entire record.

The findings of the Trial Examiner, in so far as they relate to controversial matters, are, in substance, as follows (50 N.L.R.B. 244):

Under the heading, "Respondent's [the Company's] Responsibility for the Activities of Various Employees," the Trial Examiner found: That instructors and thread girls (members of the plant union), of whom there were some 44, were supervisory employees and representatives of the Company; that Rose Todd, who was active in the formation and administration of the plant union, was in fact a supervisor and was regarded by the other employees "as a person in whom the management had confidence and whose views reflected those of the management"; that Hobart Atherton, who was employed in the maintenance department of the Company, and who was active in the formation of the plant union, was a supervisory employee in charge of that department; that Florence Strickland, of the pattern department, Lena Tyhurst, of the inspection department, Martha Gray, of the outlet store, Ortense Root, of the sample department, Heath Cowan, of the receiving department, Marvin Price, of building maintenance, Ted Scholes, of the cutting department, and Mary Bogert, of the dividing department [all of whom had been active in the organization known as the Loyalty League], were supervisory employees.

The Trial Examiner, under the heading, "Events Prior to the Effective Date of the Act [National Labor Relations Act]," found: That prior to 1934 no effort had been made to organize the employees of the Company; that in 1934, the International established an office in Kansas City, Missouri, and announced in the papers that an attempt would be made to organize the garment workers of Kansas City; that on March 15, 1934, and December 4, 1934, the International held open meetings, to which the employees of the Company were invited; that supervisory employees of the Company, including Mrs. Reeves, then production manager, and Mrs. Hyde, personnel manager, attended the meetings in a group; that at least a dozen of the employees joined the International and that several became active in its behalf; that employees were called to the office of Mrs. Reeves, questioned about their interest in the International, and warned against joining it; that Mrs. Gray, "in charge of respondent's [the Company's] outlet store," said that it was a "shame" that an employee had joined the International; that a substantial number of employees were laid off or discharged shortly after they joined the International; that about 12 employees, in June, 1934, discussed joining the International at the home of Glynn Brooks Yarnell, an employee of the Company and a member of the International; that Yarnell was discharged in July, 1934, although she had worked for the Company since 1924; that, within a few months, all except one of the employees who had met at her home were either laid off or discharged; that the International, on December 6, 1934, filed a charge against the Company under Section 7(a) of the National Industrial Recovery Act, 48 Stat. 198, asserting that eight employees had been laid off because of their having joined the International; that testimony in that proceeding was completed, but, before it was decided, the Act was declared unconstitutional; that in the latter part of 1934 and the first part of 1935, all of the other employees who were known to have joined the International were transferred from the main factory of the Company to a temporary branch factory which was used during the busy season; that when the use of the temporary building was discontinued, the employees, most of whom had several years' service, were laid off, while employees working in the main factory were retained; that, as a result of these events, employees became hesitant about joining the International, and those who joined denied having done so, and employees who had not joined were careful not to talk

with those suspected of having joined, for fear of discriminatory treatment with respect to their jobs; that in February, 1935, Martha Gray, "in charge of the * * outlet store," and Florence Strickland, "in charge of the pattern department," formed an organization among the employees, known as the "Nelly Don Loyalty League"; that it was initiated at a meeting at the home of Mrs. Gray, attended by about 50 employees representing the various sections of the factory; that, within a few days, substantially all employees had joined; that Florence Strickland, in circulating membership cards, stated that Mrs. Donnelly (Mrs. Reed) would close her doors before she would have a union shop, and that employees should sign the cards to keep their jobs; that a statement was circulated along with the membership cards to the effect that the employees protested against and would resist outside interference with the business of the Company or with their relations to the Company, and that they recognized that they had had generous and fair treatment from Nelly Don (Mrs. Reed), President of the Company, and reposed confidence in her rather than in "professional agitators who are sent here to create discontent among employees of the company." The Trial Examiner found that Florence Strickland refused to allow Virginia Stroup, an employee who was president of the International Local, to become a member of the Loyalty League, because Stroup belonged to "another organization"; that Lena Allison, an instructor, refused membership to Frances Reidell on the ground that she was a member of the International; that on February 8, 1935, a mass meeting of the employees was held during working hours, on the second floor of the building occupied by the Company, presided over by Martha Gray, who explained the meaning of the word "loyalty"; that meetings of the Loyalty League were regularly held on the second floor of the building, upon notices transmitted by Mrs. Wherry, factory manager, or by the switchboard operator of the Company, and transmitted to the employees in each section by their instructor; that each section had a representative in the League, elected by the employees in the section; that virtually all of the Company's supervisory employees, including Mrs. Reeves, Mrs. Hyde, Dewey Atchison, Martha Gray, and Florence Strickland, were members of the Loyalty League; that "the League had

songs of loyalty and sponsored the wearing of pins bearing the initial 'L' as a demonstration of loyalty to Nell Quinlan Reed"; that, by means of the League, the Company fostered an organized employee resistance to outside unions; that evidence of these events, which preceded July 5, 1935, the effective date of the National Labor Relations Act, is competent because the League continued to exist after the Act went into effect, and for the purpose of evaluating what afterwards transpired; that the League was dominated and controlled by the Company and was used by it to prevent its employees from joining the International or any other outside labor organization.

Under the heading, "Events Prior to April 27, 1937; Interference, Restraint, and Coercion," the Trial Examiner found: That from the time that the Supreme Court decided that the National Industrial Recovery Act was invalid until March, 1937, the International made no further effort to organize the employees; that during this time the League continued in existence and new employees were solicited to join; that on February 26, 1937, there appeared in the Kansas City Star an article stating that the International had announced a campaign to organize the Company's employees and had appropriated a large sum to be spent in a drive for recognition of the International as the collective bargaining agent for the Company's employees; that on March 2, 1937, Mary Sprofera and Inez Warren, shipping clerks, during working hours went through the factory and secured the signatures of approximately 800 factory employees to a pledge reading as follows: "We, the undersigned, as members of the Donnelly Garment Company wish to make it known we are positively happy and contented with the positions which we hold with the organization and refuse to acknowledge any union labor organization. We are thankful for the real humanitarian interest extended by our employer, Mrs. Reed;" that, with six exceptions, the instructors and thread girls did not sign the petition initially; that three employees, Sylvia Hull, Mamie Carlson and Elsie Greenhaw, at first refused to sign; that two of them subsequently signed for fear of losing their jobs, their names being later erased; that in the afternoon of the day the pledge was signed, Mary Sprofera and Inez Warren took it to Mrs. Reed at her home and presented it to her; that, as the

result of arrangements made between Mrs. Reed and the representative of the Kansas City Star, a picture of these employees presenting the pledge to her appeared on the front page of the paper, accompanied by the statement that Mrs. Reed was going to place the pledge in the cornerstone of the new building she was planning to erect. The Trial Examiner found that Mrs. Reed, shortly thereafter, expressed to her office manager, Mrs. Keyes, a wish that all the employees would sign the pledge; that Mrs. Keyes requested an employee, Pauline Shartzer, to circulate the pledge among those who had not signed it; that the signatures of all employees, including supervisors, excepting the three employees who had refused to sign, were obtained and presented to Mrs. Reed; that, by permitting Mary Sprofera, Inez Warren and Pauline Shartzer to circulate the pledges in the factory during working hours, under the circumstances outlined, the Company interfered with, restrained and coerced its employees in the free choice of a collective bargaining agent.

The Trial Examiner found that on March 6, 1937, the Kansas City Journal-Post carried an article stating that David Dubinsky, President of the International, at a meeting of 700 union members in Kansas City, had launched a movement to organize the employees of the Donnelly Company; that this announcement was followed by a letter to the Company from the International, under date of March 9, 1937, requesting a conference between the International and the Company; that the Company did not reply to the letter; that a meeting of all the employees of the Company took place during working hours on the afternoon of March 18, 1937, on the second floor of the building occupied by the factory; that employees were notified orally by their instructors that they were to attend; that the instructors had been notified by Mrs. Wherry or over the Company's telephone system; that most of the supervisory employees attended the meeting, including Mrs. Hyde, Mrs. Gray and Mrs. Reeves, and the instructors and the thread girls; that Rose Todd, with the assistance of Hobart Atherton, "both of whom were officials of the League and supervisory employees," called the meeting; that Rose Todd presided; that chairs for the meeting were rented by the League; that the meeting was sponsored by the League and its officials; that Mrs. Reed was invited to address the meeting; that she brought with her the letter which the Company had received from the International "requesting a conference"; that the letter was read to the employees; that Mrs. Reed then expressed her pleasure at having received the "loyalty" pledge which had been presented to her on March 2, stated that the Company was an institution to be proud of, that it had taken care of its employees by keeping the factory in operation during the depression, and that she intended to continue to run the business; that she spoke of threats of violence that the International was alleged to have made against employees of the Company, and promised protection against such violence. The Trial Examiner found that the Board's witnesses testified that Mrs. Reed said that she would close her factory before she would permit it to be unionized, and would not allow "Dubinsky or any other 'sky' to tell her how to run her business"; that the Company's witnesses testified that Mrs. Reed stated that "Neither Dubinsky or any other but-tinsky is going to intimidate me or the company into forcing you [the employees] to join the International against your will." The Trial Examiner found that it was unnecessary to resolve the conflict in this testimony, and that Mrs. Reed's own version of her speech constituted an unfair labor practice. The Trial Examiner found that the meeting was sponsored by the League; that supervisors were present; that the employees must have been aware of the anti-union character of the meeting; that, while many of them may have feared the alleged threats of the International, the Company, instead of permitting them to decide what attitude they would adopt toward the International, "seized upon such fears as may have existed to build up and strengthen a militant employee opposition toward that labor organization"; that Mrs. Reed's remarks indicated that the International was the common enemy of both the Company and its employees, and promised protection against it; that she labelled David Dubinsky a "but-tinsky" who was seeking to force the employees to join the International; that, while Mrs. Reed "sought to appear as a disinterested defender of the * * * employees in the exercise of their right to join or not to join a labor organization," her remarks made it plain that the Company's attitude toward unionization had not changed and that membership of

any of the employees in the International was not to be tolerated. The Trial Examiner found that the Company, by its sponsorship and domination of the March 18, 1937, meeting of its employees and by Mrs. Reed's talk at that meeting, interfered with, restrained and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act.

The Trial Examiner found that on April 22, 1937, the Kansas City Journal-Post carried an announcement by the International that Sylvia Hull, one of the Company's operators, had been named as a delegate to a convention of the International; that the next day, when she went to work, she was subjected to a demonstration by other employees, who demanded to know what authority she had to represent them at the convention, sang Loyalty League songs, and demanded the surrender of her Loyalty League pin (which she surrendered upon being paid its cost); that the instructor in the section where Sylvia Hull worked was present, but did not order the demonstrators back to work; that Mary Bogart, in charge of the dividing section, was present and pointed Sylvia Hull out to some of the demonstrators; that Mrs. Hyde, employment manager, appeared and told the demonstrators to go back to work; that the demonstrators stated they would not work while Sylvia Hull was there; that Mrs. Hyde took Sylvia Hull down to the office; that a number of the demonstrators followed, shouting that they would not return to work until they heard Sylvia Hull say she would go home; that she then said, "I will go home, I didn't know the girls felt this way about it or I wouldn't have done it"; that Mrs. Hyde told Sylvia Hull that she would have to go home; that she replied that she did not want to quit but would go home for the day; that she gave to Mrs. Hyde a telephone number through which she might be reached; that on the same morning a similar demonstration took place near the machine operated by Fern Sigler, who was wearing an International pin; that this demonstration subsided when Mr. Baty, the factory manager, accompanied by Rose Todd, ordered Fern Sigler from her machine to the office; that, as she left the floor, the operators shouted, "we are not going to work as long as she remains here"; that when Baty insisted on sending Fern Sigler home, she argued with him that she had a right to join the International and that it was the

duty of the Company to control its employees; that Baty replied, "We don't go in for the Wagner Act, we are just running our business here not a law office"; that Rose Todd then stated, "We are going to run an open shop as long as the majority feels that way"; that the conference was participated in by Baty, Mrs. Hyde, Rose Todd, and Fern Sigler; that Fern Sigler was sent home; and that Baty promised to talk to the operators and quiet them down and to recall Fern Sigler when the unrest had subsided, but that, despite his promise, Baty did nothing to allay antagonism toward the International. The Trial Examiner found that the Company approved of and encouraged the demonstrations and took advantage of them to show its hostility to the International and its support of anti-International activities, and thereby interfered with, restrained and coerced its employees in violation of the rights guaranteed them under Section 7 of the Act. He also found that the Company, by using the League and its officers for the purpose of impeding and preventing the organization of the Company's employees by the International, interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act.

Under the heading, "Domination and interference with the formation and administration of the D.G.W.U. [the plant union] and contribution of support; interference, restraint, and coercion," the Trial Examiner made the following findings: That shortly after the March 18, 1937, meeting, a committee composed of Rose Todd, Hobart Atherton, and Sally Ormsby, employed Frank E. Tyler, an attorney; that when Tyler asked for a retainer [of $500], Rose Todd borrowed $1,000 from the First National Bank of Kansas City, upon the unsecured note of the Loyalty League, deposited the money in the Loyalty League checking account, and gave to Tyler a League check signed by Todd as president and Hartman as treasurer; that, while the first conference with Tyler related to the possibility of obtaining an injunction against the International, Tyler, after the National Labor Relations Act was held constitutional, on April 12, 1937, suggested the formation of an independent union; that on April 27, 1937, a mass meeting of all the Company's employees was held during working hours, on the second floor of the building in which the

Company's plant was located, upon notice given by the instructors, who had been notified by Mrs. Wherry or over the telephone system; that instructors and thread girls attended the meeting along with the operators in their sections; that chairs for the meeting were rented and paid for by the Loyalty League; that Rose Todd, who was still the President of the League, presided at the meeting; that she stated that Mr. Gossett and Mr. Tyler, whom she had consulted, advised forming a plant union; that she further stated that the Loyalty League, being a purely social organization, would not take care of the situation; that another organization was necessary to represent them; that she pointed out that a union would have to be formed if they were to successfully resist organization by an outside union; that she told the employees that the new organization would be called the "Donnelly Garment Workers' Union," and that, although she was as distressed as they were at having to use the word "union", it seemed to be necessary; that Mr. Tyler was then introduced by Rose Todd; that Tyler stated, in substance, that, some weeks before, several of the employees came to his office and employed Mr. Gossett and himself as legal advisers of the employees; that he was acting as such; that, whether they believed in unions or not, he and Mr. Gossett believed that it was to the employees' best interests to organize their own individual unaffiliated plant union; that Tyler stated that one of the reasons for the organization was the fact that the International had sent a representative to its national convention and "in order to stop this and make it clear that you are speaking for yourselves through your own representatives whom you choose, we think your own union is desirable"; that he also stated: "I do not think this action can or will be considered as an act of unfriendliness to your employer. I believe they recognize your right to take this step and it isn't an unfriendly act to them. In fact, it is much better for them and yourselves for you to have your own union with your own representatives rather than having a group trying to represent outsiders from New York"; that Rose Todd then said: "Well, we are together as an entire group of employees. Let's form this organization"; that it was decided by a unanimous vote, without discussion, by the approximately 1300 employees to form such a union;

that a nominating committee of five was appointed by Rose Todd to select a General Chairman and eight Group Chairmen to serve as representatives and officers of the new organization; that membership cards, previously prepared, were distributed; that Tyler then read the by-laws, which he had prepared, which were unanimously adopted without alteration; that the officers named by the nominating committee were unanimously elected; that the 1300 membership cards were collected, and the meeting declared adjourned. The Trial Examiner found "that the concept of an independent union originated with respondent's [the Company's] supervisory employees and further, that the respondent [Company] through the activities of its supervisory employees gave approval, and lent assistance and encouragement to the D.G. W.U. [the plant union]."

Under the heading, "Membership and participation by other supervisors in the D.G.W.U. [the plant union]," the Trial Examiner made findings that Dewey Atchison, production engineer, joined the plant union at the April 27, 1937, meeting, but resigned on July 14, 1937; that instructors and thread girls regularly attended the meetings of the union; that other supervisory employees, named by the examiner, attended and took part in meetings; that at the meetings where officers were elected, there were few, if any, contests; that Rose Todd continued on as chairman; that at various times the question as to whether department heads and instructors should have the right to membership was raised; that Rose Todd took the position that, aside from the executives of the Company, Mr. Keyes, Mrs. Keyes, Mr. Green, Mr. Baty, and Mrs. Hyde, all employees were eligible; that employees at various times expressed the view that the presence of instructors and department heads at meetings prevented other employees from speaking freely of their complaints; that, through its supervisory employees, the Company continued its control and direction of the plant union.

Under the heading, "The contracts; closed-shop, check-off and piece-work rates," the Trial Examiner made the following findings: That on April 28, 1937, the day following the organization of the plant union, Rose Todd presented the membership cards to Mrs. Reed, stating that the plant union had been organized by the

unanimous vote of the employees and represented a majority; that Mrs. Reed assured her that the Company would consider the matter; that on May 6, 1937, the Group Chairmen of the plant union met with Mrs. Reed, and told her that they would want a contract covering hours, wages, and working conditions, "which up to now have been satisfactory," and that they desired a closed shop; that Mrs. Reed at once replied, "I understand that is very essential to industrial peace"; that the representatives of the plant union told Mrs. Reed they wished to pay part of Rose Todd's salary, and that Mrs. Reed, in agreeing, stated, "I do not feel at the present time that you [Todd] need give all of your time to the union"; that Tyler thereafter prepared a proposed agreement containing a closed-shop provision, which was approved by the Group Chairmen of the plant union on the morning of May 27, 1937; that it was presented to Mrs. Reed, who stated, in effect, that the spirit of the agreement was satisfactory, but that changes in phraseology might be needed; that Mrs. Reed and other representatives of the Company met with Tyler and Rose Todd at three o'clock that same afternoon, and that Tyler, after the conference, reported to the Group Chairmen that the Company had suggested a few modifications of the proposed contract, which he recommended should be accepted; that on June 22, 1937, a supplemental agreement covering minimum wages for time workers and minimum weekly guarantees to piece workers, was entered into; that the terms of this contract were not submitted to the membership of the plant union for approval before or after its execution, although it fixed wages for a year and had a provision for an automatic extension; that the plant union demanded a minimum wage of $16.50 a week for the lowest paid piece workers; that Rose Todd stated that the International had announced that it was seeking a $16 weekly minimum in the garment industry, and that she thought it would be a good idea to improve on that to defeat efforts of the International to organize the Company's employees. The Trial Examiner found that, by its terms, the original agreement of May 27, 1937, was to remain in effect for a period of two years, while the supplemental wage agreement was to expire July 1, 1938, subject to the provision for automatic extension from year to year unless either party notified the other in writing of a desire to terminate it; and that the two contracts have continued in effect without change.

The Trial Examiner found that in August or September, 1937, the Company agreed, at the request of the plant union, to a check-off of the monthly dues of its members (except the salesmen); that employees signed cards, prepared and distributed by the Company agreeing to permit the dues to be checked off; that the plant union kept no records of individual dues paid, and issued no receipts to members; that the checks for dues checked off, which were turned over each month to the plant union, range from $250 to $325 a month.

The Trial Examiner found, with respect to the committee consisting of Lulu Nichols, Josephine Spalito, and Rose Todd, appointed by the Group Chairman to adjust piece-work rates, that Nichols was a supervisory employee of the Company and that Spalito was her assistant; that it was their duty to fix piece-work rates for the Company; that the same persons, therefore, represented the Company and the employees in negotiations in regard to piece-work rates, and that the employees were forced to become "members of an impotent collective bargaining agency * * *."

Under the heading, "Respondent's [the Company's] contribution of support to the D.G.W.U. [the plant union,]" the Trial Examiner found: That the meeting at which the plant union was formed and the succeeding three or four membership meetings were held during working hours; that the meetings were held in the building where the factory was located; that prior to May 10, 1937, the Company did not lease the second floor, on which the meetings were held, and the plant union was permitted to use it as a meeting place without charge; that on May 10, 1937, the Company leased the second floor, and the plant union continued to use it as a meeting place until April, 1938, when the Company remodeled a portion of the first floor to serve as an auditorium; that thereafter the plant union used the auditorium for its meetings; that not until November, 1937, was the question of paying rent raised; that the first rental payment to the Company was made in April, 1938, and was at the rate of $3.00 for each meeting held during the preceding twelve months; that this payment of rent was an afterthought; that Rose Todd had announced in meetings

that the use of the Company's facilities was entirely proper; that meetings of the Group Chairman, who composed the executive committee of the plant union, were, prior to May, 1938, held in the office of Beulah Spilsbury, who was in charge of the designing department, and thereafter in the auditorium, and that no rental was paid for the use of Company property by the Group Chairmen; that notices of meetings of the plant union and of the meetings of Group Chairmen were given through the means of communication furnished by the Company; that Rose Todd, in giving notice of meetings, collecting assessments and giving instructions, used the messenger service of the Company; that piecework operators who served as Group Chairmen or officers were paid for time lost in attending to the business of the plant union; that Rose Todd continued to receive her full salary as an employee of the Company and, in addition, was paid $65 a month by the plant union; that she was permitted by the Company to devote as much time as she desired to the business of the plant union without deduction in pay; that she carried on such business during working hours; and that in organizing the employees at the Company's St. Joseph plant she lost half a day without a salary deduction; that at a meeting of May 11, 1937, Rose Todd stated that union work would be conducted at a desk on the ninth floor of the plant and that she could be reached at any time necessary; that her desk was the plant union's only office; that the business of the union was transacted there; that the records of the union were kept in a file case belonging to the Company; that Rose Todd collected money for the union on Company time; that when she took her vacation in December, 1937, she told the Group Chairmen that a Miss Riddle would be at the desk from 11 a. m. to 12:45 each day to transact union business; that the membership cards of the plant union were mimeographed after working hours by employees on a machine belonging to the Company; that copies of the plant union's by-laws were made on a ditto machine of the Company; that the plant union had no typewriter, and a Company machine was used for typing minutes of meetings of the union and its Group Chairmen.

Under the heading, "The Alleged Discharges," the findings of the Trial Examiner are: That Sylvia Hull, whose employment with the Company terminated April 23, 1937, had worked for the Company for nearly eight years; that she joined the International on March 23, 1937; that on April 22, 1937, it was publicly announced in a Kansas City newspaper that she had been selected by the International to represent the Company's employees at the International's convention; that, after the demonstration to which Sylvia Hull was subjected the following day at the plant, she went home with the understanding that she would be recalled; that she did not voluntarily quit her employment, and acquiesced, under pressure, in a one-day lay-off; that she was temporarily laid off by the Company because of her union activities and affiliations; that the Company thereby discriminated against her in regard to her tenure of employment, and thereby discouraged membership in the International, and restrained and coerced its employees in the exercise of the rights guaranteed in Section 7 of the National Labor Relations Act; but that the Company, through the efforts of Mrs. Hyde, attempted to recall Sylvia Hull to work and had not discriminatorily refused to reinstate her. The Trial Examiner, in dealing with the issue of the alleged discriminatory discharge of May Fike, found that she was not discharged because of her union affiliations or activities.

In conclusion the Trial Examiner found that the activities of the Company set forth in his findings "tend to lead to labor disputes burdening and obstructing commerce and the free flow of commerce." He recommended to the Board the form of order which he thought should be entered by it.

The Board, after hearing exceptions to the report of the Trial Examiner, entered its decision and order, on June 9, 1943, affirming his rulings and adopting, with certain unimportant exceptions, his findings, conclusions, and recommendations. The Board's order of June 9, 1943, which is the order now under review, directed the Company to disestablish the plant union as the representative of the Company's employees; to cease giving effect to the contracts with the plant union; and to reimburse the employees for dues and assessments deducted from their wages by the Company on behalf of the plant union.

In its decision, the Board said: "In remanding the case to the Board for further hearing, the Circuit Court directed that the respondent [the Company] and the D. G. W. U. [the plant union] be permitted

to adduce the previously proffered testimony of respondent's [the Company's] employees to show, in substance, that they formed and joined the D. G. W. U. of their own free will and that they were not influenced, interfered with, or coerced by the respondent in choosing that organization as their bargaining representative. In compliance with the Court's mandate and pursuant to the respective offers of proof submitted by the respondent and the D. G. W. U. at the original hearing, the Board permitted the introduction of such testimony. We have carefully considered all such evidence adduced by the respondent and the D. G. W. U. We find, however, that the testimony in question does not overcome more positive evidence in the record that the respondent committed acts of interference and assistance in the formation and administration of the D. G. W. U. which subjected that organization to the respondent's domination and which removed from the employees' selection of the D. G. W. U. the complete freedom of choice which the Act contemplates. Since we find the testimony here adduced totally unpersuasive that the employees voluntarily designated the D. G. W. U., we are moreover impelled to adhere to the opinion, derived from our experience in administration of the Act, that conclusionary evidence of this nature is immaterial to issues such as those presented in this case. A consideration of all the evidence convinces us, and we find, that the respondent dominated and interfered with the formation and administration of the D. G. W. U. and contributed support thereto; and that the respondent thereby interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act."

We have set forth in detail the findings of the Trial Examiner because they state the facts which the Board contends are established by the evidence. Briefly stated, the determination of the Board that the plant union was sponsored, interfered with and dominated by the Company, is based upon the following conclusions: (1) That the Company, prior to the effective date of the National Labor Relations Act, was hostile to the International and to outside unions; (2) that the Loyalty League was organized by supervisory employees of the Company for the purpose of resisting organization by the International; (3) that the plant union was an offshoot or successor of the Loyalty League; (4) that supervisory employees participated in the organization and in the administration of the plant union; (5) that the plant union did not function as a true bargaining representative of the employees, and that the Company, in effect, bargained with itself as to wages, hours, and working conditions; (6) that the Company made substantial contributions of its facilities to the plant union; and (7) that Mrs. Reed's speech to the employees at the March 18, 1937, meeting was coercive. In other words, the position of the Board is that the organization of the plant union was solely attributable to efforts of the Company and its representatives to prevent its employees from joining the International.

The Company and the plant union contend that the determination of the Board is based upon a distortion and disregard of the competent and relevant evidence introduced and proffered by them during the hearings. They contend that this evidence shows conclusively that the formation of the plant union was solely attributable to the fraudulent and violent methods which they assert were, at the time, being employed by the International to compel employers engaged in the garment industry in Kansas City and the Southwest to force their employees to join the International on penalty of having the business of the employers destroyed.

The Company and the plant union contend that the circumstances surrounding the organization of the plant union were, in general, as follows:

That the International, in the year 1937, was engaged in a campaign to organize the garment industry in Kansas City, including the Company, which was the largest local employer engaged in that industry; that on February 26, 1937, Meyer Perlstein, Southwest Regional Director of the International, publicly announced in the press that the plan was to send a letter to the Company within a week, suggesting a conference to establish collective bargaining on the question of wages and working hours, and stating:

"* * * If the firm refuses, we'll go to the consuming public of the country and advise buyers of the wages and hours prevailing there now.

* * * * * *

"Part of the union's [the International's] campaign directed against the Donnelly

Garment Company will be to send six women to cities and towns where its garments are sold 'advising retailers and labor organizations.' * * *

"The union [the International] claims only twenty-five members among the Donnelly workers, but officials said 'hundreds of others are related to union members.'

" 'Within a year, we'll have it completely organized.' Mr. Perlstein said, 'As soon as we have enough members, we'll call a strike. This will be in addition to carrying our side to the consumers.' "

The Company and the plant union assert that this threat of a secondary boycott and a strike caused resentment and fear among the employees, and that they voluntarily, and without suggestion of any officer of the Company, circulated what has been referred to as the "loyalty petition", stating that they were contented, refused to acknowledge any outside interference, and were thankful for the humanitarian interest extended to them by Mrs. Reed; that on March 6, 1937, David Dubinsky, President of the International, in the course of a speech made in Kansas City, said: "Reed [the husband of Mrs. Reed, President of the Company] will receive a polite letter within a few days inviting him to confer with Kansas City labor leaders about signing a union contract. If he refuses to meet with us, we shall start our campaign"; that on March 9, 1937, Perlstein prepared a letter which was mailed to the Company concerning alleged grievances;[2] that the Company did not reply to the letter because it regarded the letter as a mass of falsehoods; that the International was without

---

"March 9, 1937.

"Donnelly Garment Company
1828 Walnut Street
Kansas City, Missouri

"Gentlemen:

"The Kansas City members of the International Ladies' Garment Workers' Union feel compelled to place before you the following grievances that should be adjusted immediately.

"Fifteen members of our Union were discharged by your firm because of their affiliations with our organization. Their case was up before the National Labor Relations Board. During the period the hearings took place the NRA was declared unconstitutional by the Supreme Court of the United States and the Government could proceed no further. The discharged workers have not as yet been returned to work by your firm.

"The Dress Industry, in which your firm is engaged, is highly unionized throughout the country. Nearly every producer of dresses is in contractual relations with our Union. The 150,000 Union workers employed in this industry are enjoying a 5-day, 35-hour working week and a $22.05 per week minimum wage scale for operators, and reasonable, fair minimum scales for finishers, pressers, cutters, et cetera. Piece workers, who compose the majority of workers in your shop as well as in the industry, are enjoying the right, through committees selected by them, of having an equal voice with the management in each shop in determining the piece rates for each garment or operation on a garment.

"The workers in most of the industry enjoy the freedom and rights of organization. Collective bargaining has been established as a permanent institution.

These are the conditions and wage scales in the organized industry.

"However, in your shop the minimum wage scale for operators is between $12.50 and $15.00 per week.

"The wage scales for finishers, pressers and cutters are at least 30 per cent lower than those that exist in the industry.

"The hours of work in your shop are 40 and more per week.

"Your workers are denied the right of joining a labor organization, and those who do, are immediately discharged. Your workers are denied the privileges of genuine collective bargaining. The piece workers in your shop have no voice as to what the piece rates should be as they are set exclusively by representatives of your firm.

"The conditions and wages under which your employees are working not only deprive them of the privileges and opportunities enjoyed by the workers in this industry, but endanger their general work standards and wage scales. Your firm has undue and unjustified advantages over your competitors. The Union believes in 'Fair Competition,' but it does not consider competition fair when it is gained solely at the expense of the workers.

"Under your system of production, workers are compelled to invest extraordinary effort, but the reward that follows is very meager in proportion to the efforts invested. Under modern methods of production such treatment of workers is not only wrong from the humane point of view, but also destructive from the economical point of view. In comparison with other shops in the industry which produce the same type of garment the

authority to represent the employees, and they were protesting against being represented by it; that as a preliminary to the planned campaign against the Company, the International, about March 15, 1937, called strikes against three smaller garment manufacturers in Kansas City, which were located not far from the plant of the Company; that the pickets of the International took possession of the buildings or building which housed these factories; that pickets, imported by the International, carried on a program of terrorism and violence; that employees of those factories who were trying to go to their work were beaten and kicked, and their clothing was torn or stripped off; that the Kansas City newspapers were filled with articles and pictures descriptive of what was taking place in these plants; that the plants were closed; that the employees of the Donnelly Company were fully aware of what was going on at these plants, and knew that the same tactics were to be employed to force the Company to compel its employees to join the International, in entire disregard of their rights and wishes; that it was the intention of the International to use the same methods to procure the organization of the Donnelly plant that had been used at other plants in Kansas City and in other cities of the Southwest region under the jurisdiction of Perlstein; that on March 18, 1937, upon premises not leased or controlled by the Company, its employees voluntarily held a meeting arranged by Rose Todd and Hobart Atherton, employees of the Company; that, at the meeting, the violence at the strikes at the Gernes, Gordon, and Missouri Garment companies and the threats that were being made against the employees of the Donnelly Campany were discussed; that the question of what action might be taken by the employees against the threatened assaults was considered; that someone was sent to ask Mrs. Reed to speak to the meeting; that she made a short talk; that a stenographic transcript of her talk was made, and represents all that she said; [3] that she left the meeting immediately after she finished her talk; that shortly after this meeting, Rose Todd, Hobart Atherton and Sally Ormsby, on behalf of themselves and other employees,

---

production in your shop is about 30 per cent higher while the earnings of the workers are about 30 per cent lower.

"We, therefore, believe that a conference between our Union and your firm, for an adjustment of these grievances, should take place immediately. The Union has named a committee which stands ready to meet a similar committee named by your firm.

"May we respectfully request that you advise us before the end of this week as to when and where it would be convenient for you to meet our Conference Committee.

"Our aim is industrial peace. We believe in intelligent co-operation between employer and employee. Such co-operation is essential for the welfare of all factors in industry, including the consuming public and community at large. Peace and harmony prevail in the major part of the Dress Industry and we are eager to extend this co-operation to include your firm. Let us join hands to avoid industrial conflict.

 Respectfully yours,
  Kansas City Joint Board
  International Ladies' Garment
  Workers' Union,
  By Wave Tobin, Manager.
Approved by: Meyer Perlstein, Regional Director, International Ladies' Garment Workers' Union.
MP"

[3]     "(March 18, 1937)
(Mrs. Reed:)

"I want to say that I am awfully happy to have this opportunity to tell you how proud I was when those girls wrote the petition out, and—well, I have had lots of nice things happen to me in my lifetime, but I have never had anything that made me so proud and so happy as that list of names that came to my house. Many of those girls I had worked with—and who had really helped to build this business into what it is now.

"Over a period of twenty-one years we have built up an institution which anybody can be proud of, anybody connected with it. I had a letter from one of the girls last night telling me that she had worked for the Donnelly Garment Company but she wasn't ashamed to tell anyone that she had worked for a garment company. When Mr. Dubinsky put Mr. Reed into the garment busiess—he didn't know he was in it before—he said he would not be ashamed to belong to the Donnelly Garment Company.

"We have an institution we can be proud of. You folks are just beginning to be initiated into the knowledge of just what kind of a business we are in, and some of the people that are in it.

"A great many years ago when I first started, a man in St. Louis said, 'You know you have to have two fires and a failure to stay in that business'. We

consulted the law firm of Gossett, Ellis, Dietrich & Tyler, of Kansas City, relative to securing protection against the anticipated attack of the International; that Mr. Tyler advised the possibility of obtaining an injunction, and asked for a retainer fee of $500; that the committee took the liberty of borrowing money from the First National. Bank of Kansas City, and paid this retainer; that the money was later repaid through voluntary contributions of fifty cents each by the employees; that on April 1, 1937, Meyer Perlstein publicly stated, with respect to the campaign to organize the employees at the Gernes, Gordon, and Missouri plants: "These three firms will soon have union shops. If not, they will never again manufacture dresses;"

that after the Supreme Court, on April 12, 1937, had sustained the constitutionality of the National Labor Relations Act, Mr. Tyler suggested to Rose Todd, Sally Ormsby, and Hobart Atherton the advisability of the employees organizing an independent union as a matter of self-protection; that on or about April 22, 1937, an article appeared in the Kansas City press, stating, in effect, that Sylvia Hull, an employee of the Company, had been named a delegate to the International's Convention at Atlantic City, to be held on May 3, to ask the International to indorse and support a strike against the Company "for failure to negotiate a contract for higher wages, shorter hours and improved conditions";[4] that Sylvia Hull had not been authorized by any

---

have not had any fires or any failures yet. We are twenty-one years old and we are pretty well grown up, and I think we know how to run our own business.

"Just from a practical standpoint, let me say that this business has grown up around the policy of year-around work. Up until the time of the depression we practically kept that up. I increased my business in the fall of the year and I increased my machines, and then we always had plenty of business the next spring. In the spring when the depression came on I put new machines in with the idea that I had the business and that I could give a certain amount of work to a certain number of women for a few months. A number of you will remember that the old girls agreed that they would share their work with the new ones that fall if they had to. They did not have to very much, but they did a little. By the time the next spring came along the new ones were the old ones, and they wanted to work too, so we have made every effort in the world to keep the plant going.

"We have built up a Nelly Don garment, and we have built up a Nelly Don trade, and each time we get up a line we try to make something that enough women will buy to keep our plant running. There has been so much talk 'Mrs. Reed isn't interested any more; Mrs. Reed doesn't care anything about it any more, etc.' Mrs. Reed may not work as many hours as she used to, but the burdens on her are bigger now than ever. No matter what anybody else may say, 'I'll be right here running this business.'

"I know you are thinking about the threats of violence that the Union is making against you and the company. I want to say that the Company and I intend to do everything possible to protect you in case of any violence. We are now trying to make arrangements with the street car company for its busses to go to certain points and pick you people up and bring you to the plant. We will let you know about this as soon as arrangements can be made.

"Many of you have been here for a number of years and you know that you have. never been asked whether or not you belong to a union. The company has not discriminated against anyone on that account and Mr. Dubinsky is not going to make me discriminate against employees because they would not belong to his Union. If you want to belong that is your own business and it is up to you to decide. I will say that neither Dubinsky or any other buttinsky is going to intimidate me or the Company into forcing you to join the International Union against your will.

"I can't say at this time what will be done to protect you against violence, but the company's attorneys will consider what legal steps might be advisable. In any event, you can understand that the company will not submit to any unlawful attacks lying down."

4 "Donnelly Worker Will Be Sent to Union Convention

"Garment Organization Seeking Support for Strike at Plant.

"Sylvia Hull, an employe of the Donnelly Garment Company, has been named, a delegate from Kansas City to the International Ladies' Garment Workers' Union biennial convention May 3 at Atlantic City, Meyer Perlstein, regional director, announced Thursday.

"The Donnelly worker, according to Perlstein, was one of a committee from that garment company who appeared Wednesday night before a joint group representing various Kansas City locals

of the employees of the Company to represent them; that the article was given to the press by Perlstein; that the publication of this article caused other employees to hold a demonstration against Sylvia Hull when she came to work the following day; that she was not physically molested and voluntarily went home; that she later attended the convention of the International at Atlantic City, where she delivered a speech, which had been prepared for her, containing false statements concerning the Company, and asking that the convention vote funds to support a strike at the Donnelly plant; that she never sought to return to her work at the plant but became a paid worker for the International; that on April 27, 1937, all of the Company's employees, with the exception of those having authority to hire, discipline or discharge, voluntarily attended a meeting, held after working hours on premises not leased or controlled by the Company, and, upon the advice of Mr. Tyler, their counsel, and for their own self-protection, by unanimous vote, organized their own union and elected its officers and a bargaining committee; that the Company did not, directly or indirectly, influence the formation of the union or contribute to its support or participate in its administration; that the plant union, after negotiations, entered into collective bargaining contracts with the Company covering wages, terms and conditions of employment, and providing for a closed shop and exclusive representation by the plant union; that these contracts provided for better wages and working conditions than prevailed in other comparable plants in the locality under contracts negotiated by the International; that the contracts negotiated by the plant union with the Company have been complied with, and all complaints which have arisen have been satisfactorily adjusted; that on May 25, 1937, Perlstein publicly urged a boycott of Donnelly products and announced that retailers would be visited and urged to refuse to buy such products, under threat of having their stores picketed, and that $250,000 had been appropriated by the International to finance its campaign; that the International sent out representatives to urge retailers to boycott the products of the Company under threat of a secondary boycott; that circulars were widely distributed, containing false statements as to wages and working conditions in the Donnelly factory, as a ground for appealing to the public to refrain from buying the Company's products.[5]

The Company and the plant union further assert:

That the employees whom the International contends were discriminatorily dis-

and requested representation at the national convention.

"Perlstein said the Donnelly committee desired one of their number to appear at the convention and ask the international body to indorse and support a strike against their employer for failure to negotiate a contract for higher wages, shorter hours and improved conditions. The Kansas City joint committee, Perlstein asserted, agreed to pay all expenses of the Donnelly delegate.

"Other delegates from Kansas City are "Cinderella Robinson and Grace Bullard, members of local No. 270 and employed by the Brand and Purltz company; Louise Smith, local No. 114, employed by the Laverne Coat shop; Anna Koval, local No. 114, employed by the Fashionbuilt Garment Company; Arlean Gaither, local No. 118, employed by the Gordon Brothers Manufacturing company; Ora Thornton and Annis Vaughan, local No. 250, employes of the Stern-Slegman-Prins company, and Miss Wave Tobin, business representative of the Kansas City locals.

"Perlstein said the executive committee of the various local unions in Kansas City would meet Thursday afternoon to consider a resolution calling on the national organization to appropriate funds to carry on a strike at the Donnelly plant.

"The delegates from this section will meet April 30 in St. Louis to go to Atlantic City by special train. Perlstein will be a delegate from St. Louis. The convention will last two weeks."

5 "To The Consuming Public:

"The Donnelly Garment Company of Kansas City, Missouri, producers of the 'Nelly Don' dress, are on the unfair list of organized labor. Therefore, we appeal to the consuming public to Help Us By Not Buying, And By Not Offering For Sale 'Nelly Don' Dresses until we establish in the shop of the Donnelly Garment Company the rights and privileges, wage scales, and hours of work that prevail in every shop in the dress industry throughout the country.

"The workers of the Donnelly Garment Company are compelled to work long hours while their wage scale is far below that which prevails everywhere else

charged by the Company in 1934 and 1935 were not discharged because of their union affiliations or activities; that the evidence relative to events which occurred prior to the effective date of the National Labor Relations Act furnishes no basis for an inference that the Company was hostile toward outside unions.

That the "Nelly Don Loyalty League," organized in 1935, was a voluntary association, formed for social purposes, and that it never functioned as a labor union or a representative of the employees; that it collected no dues and held no regular meetings; that it was not the predecessor of the plant union and did not assist or influence the formation of that union; that the League continued to exist and operate after the formation of the plant union, exactly as before.

That the instructors, thread girls, and other employees, whom the International asserts, and the Board found, were supervisory employees, ineligible for membership in the plant union, were in fact not supervisory employees, and that employees holding comparable positions in plants organized by the International were regarded as eligible for union membership.

That the Company refused to provide for a check-off of union dues in its contracts with the plant union, and only consented to deduct them after each employee had individually authorized the Company, in writing, to make the deduction.

That the use by the plant union of typewriters, mimeograph machines and other facilities belonging to the Company was never consented to or known by the Company.

The picture drawn by the International and the Board is that of an employer which, solely because of hostility to the International, has influenced, and coerced its employees into forming a plant union and entering into a closed-shop agreement, thus depriving them of their freedom of action and choice and making them, in effect, the bondservants of their employer.

The picture which the Company and the plant union present is that of a group of employees, on friendly terms with their employer, satisfied with their wages and working conditions, and desirous of avoiding strikes and labor troubles, who, upon the advice of their counsel and for their own protection against an unjustified and unlawful attempt by the International to force them to become, and to force their employer to make them become, members of that union against their will, voluntarily formed and have satisfactorily administered their own completely independent union.

The question as to which is the true picture, in so far as that presents a question of fact, is not a matter with which this Court can concern itself. Our sole function is to determine whether the Board, acting within the compass of its power, (1) has held a proper hearing, (2) has made findings based upon substantial evidence, and (3) has ordered an appropriate remedy. National Labor Relations Board v. Bradford Dyeing Association, 310 U.S. 318, 342, 60 S.Ct. 918, 84 L.Ed. 1226; Eagle-Picher Mining & Smelting Co. v. National Labor Relations Board, 8 Cir., 119 F.2d 903, 907.

The Company and the plant union assert that the trial accorded them was unfair

---

in the dress industry. The speed-up system is such that most of the 1300 workers employed by this firm are in a state of exhaustion and fatigue. Many of them must have constant medical attention because of the nervous strain imposed upon them by this system. Numerous workers suffer complete nervous breakdowns.

"On the next page of this booklet we reproduce a copy of a letter which was sent to the Donnelly Garment Company. The firm has not replied to this letter, but has instead, organized a company union which has been named the 'Donnelly Garment Workers' Union.' The Company has also more firmly entrenched in their shop the Spy System which they established long ago. The Spy System is under the direct supervision of a notorious strike-breaking detective agency, through which every worker is spied upon. Those who dare to complain of conditions, or join a labor organization, or express a favorable opinion of a union, are immediately discharged.

"We appeal to you to help us establish in this shop, conditions and wages that befit civilized human beings. We Appeal To You Not to Purchase The 'Nelly Don' Dress.

Kansas City Joint Board,
International Ladies Garment
Workers' Union,
Executive Office:
1022 Baltimore Avenue,
Kansas City, Missouri."

because of (1) the Board's refusal to designate another examiner to preside at the hearing after remand; (2) the bias and nonjudicial attitude of the Trial Examiner and the Board throughout the entire case; (3) the failure to give consideration to employee testimony; (4) the refusal to permit the Company to prove a conspiracy on the part of the International, by fraud and violence, to force the Company's employees to become members of that union; (5) the receiving, over objection, of the evidence of the Board relating to events which occurred in 1934 and 1935, and the refusing to receive evidence of the Company relative thereto; (6) the Trial Examiner's direction of the order of proof and his limitation of testimony; (7) the exclusion of competent and material evidence.

1. The refusal of the Board to designate another Trial Examiner.

The contention of the Company and the plant union is that the Trial Examiner who had conducted the first hearing, and was designated to hold the second hearing, had completely prejudged the case and that his rulings, set out in the affidavit of prejudice presented to the Board, demonstrated that he had a fixed opinion as to the worthlessness of evidence which this Court had ruled was admissible and must be considered. The fact that we said in our former opinion that "it cannot be said that it appears from the record of the proceedings before the Examiner and before the Board that there was a denial of due process because of bias and prejudice or collusion" (123 F.2d 215, 219), was not a ruling that, in case the Board granted a further hearing, the same Trial Examiner would be a suitable person to conduct it, over the protest of the Company and the plant union. A few of the Trial Examiner's remarks, at the first hearing, about the value of the proffered testimony of the employees were: "No, I don't think it is of any value in the issues in this case, to parade these people on the stand. Now, if that is your idea, you may make as complete an offer as you care to with respect to that matter." "I think I should tell you now that if there is any further testimony of that kind, you can put it in an offer of proof, because I don't think it is material to the issues here * * *." "Now, I don't consider that testimony, if it were given, of any value when they are put up here on the stand and testify under oath, with the respondent [the Company], and in some cases, the fore-

man and the superintendent present. It might result in coercion, and it might not." With all due respect to the Trial Examiner, who conducted himself with courtesy and patience under conditions which were not always tranquil, it is hard to believe that he could be entirely impartial in weighing evidence which he, sincerely, considered to be of no value or materiality. We think that a party to a controversy such as this who believes and has substantial grounds for believing that he cannot have a fair trial before a certain trial examiner, should not be forced to present his case to that examiner. We realize, of course, that the Board is at liberty to conduct its proceedings in its own way, through its own instrumentalities, subject only to the condition that the proceedings shall measure up to the constitutional requirements of due process. The unfairness of trying issues of fact to those who may have prejudged them has been dealt with in Winebrenner v. United States, 8 Cir., 147 F.2d 322, 328-329.

2. The alleged bias and nonjudicial attitude of the Trial Examiner and the Board.

It is contended that it appears from the record that the Trial Examiner and the Board had prejudged the case and were determined to convict the Company at all events, disregarding its testimony whenever necessary to make a finding favorable to the Board. In order to sustain a ruling to that effect, it seems to us that it would be necessary to be able to demonstrate from the record to a moral certainty the existence of such a mental state. The presumption is the other way, Cupples Co. Manufacturers v. National Labor Relations Board, 8 Cir., 103 F.2d 953, 958, and inquiry into the mental processes of the Board members is not a function of this Court. Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 82 L.Ed. 1129. The record is persuasive, as we have already pointed out, that the Trial Examiner had, upon the first hearing, reached the conclusion that the testimony of employees upon the issue whether their plant union was or was not dominated by the Company should be disregarded. We think, however, that a ruling by this Court that the proceedings of the Board lacked due process because of its alleged bias and prejudice against the Company and the plant union is not justified.

3. Failure to consider employee testimony.

The employee testimony which the Company and the plant union contend was given no consideration by the Board is that which was thought by the Examiner and the Board, upon the first hearing, to be immaterial, and which we held to be competent and material (123 F.2d 215, 222-223). Upon the second hearing, the Trial Examiner received the testimony of eleven of the Company's employees relative to how and why they came to organize the plant union and what sort of an organization it was and is. He then ruled that further evidence of employees would be cumulative. There was other similar employee testimony in the record of the first hearing, as the Board points out, but it is, of course, obvious that that evidence had, prior to the remand, been ruled by the Board to be immaterial, and had therefore not been considered. Although the plant union complains that the Trial Examiner heard none of the employee testimony proffered by it, it is apparent that this testimony would have been no different than the testimony of the eleven witnesses produced by the Company and that the testimony received was for the benefit of both. The ruling by the Trial Examiner that further employee evidence would be cumulative was equivalent to a ruling that all of the employees offered as witnesses would have given the same evidence as that which was received. We are satisfied that the Examiner was justified in limiting the number of witnesses as he did.

There is much force in the contention that, while the employee evidence was received, it was still regarded by the Board as being entirely immaterial and worthless. The Board was of the opinion, and is apparently still of the opinion, that the ruling of this Court relative to the admissibility of such evidence was and is erroneous. The Board is, of course, entitled to its opinion in that regard. The Board's attitude toward this employee evidence was well expressed by its counsel at the second hearing, after an employee had stated that she had joined the plant union of her own free will.[6] As already pointed out, the Trial Examiner states that he has based

---

[6] (Miss Weyand:) "I would like to make a statement in connection with that question. While we are here to take such evidence under the remand of the Court, it is my position that the question is one which should not properly be directed to the witness. I am, of course, acquiescing in the Circuit Court of Appeals ruling we do take such evidence, but I would like to make a statement for the record, of my position on that question.

"I think such questions are improper in a Labor Board hearing, in the first place because they violate the principle of a secret election stated in Section 9 of the Act. The Congressional intent there expressed was clearly that employees should not be required to disclose in the presence of their employers or any representatives of the employers or in the presence of anyone else, if they did not so desire, whether or not they favored one union over another union.

"To ask an employee who is still employed by the employer, in the presence of employer's representatives, whether or not she favors a given union, violates the principles of secret elections. I think the question is improper for a second reason, that is because the Board's inquiry in a Labor Board case is whether or not the employer interfered, restrained or coerced employees. The Congressional intent is clear that that inquiry is directed to whether or not the employer did certain acts, which normally and reasonably have the effect of interfering with, restraining or coercing.

"It is not the Board's job to inquire whether or not the restraint, interference or coercion actually had that effect on any given employee. The Board is not required to look into the minds of the employees and see if any one or more employees are actually interfered with, restrained or coerced.

"The Courts have repeatedly held that espionage, even though unknown to any of the employees, constituted interference within the meaning of the Act and has held immaterial that no employee knew he was being spied upon, and if it was held immaterial that the employer had not used the information that he received through the espionage for the purpose of depriving the employees of other rights in the Act.

"There is a third reason why I think the question is improper in a Labor Board hearing, and that is that the proof, if we can assume it is proof, that any employee was not interfered with, restrained or coerced, has no weight or bearing upon whether or not any other employee was restrained, interfered with or coerced. That is a general proposition, that negative evidence does not establish the absence of affirmative evidence in other instances.

his findings upon the entire record. He makes no specific reference to the employees' testimony as to the plant union being their voluntary and uninfluenced choice. The Board, in its order adopting the findings of the Examiner, said with respect to such evidence: "Since we find the testimony here adduced totally unpersuasive that the employees voluntarily designated the D.G.W.U. [the plant union], we are moreover impelled to adhere to the opinion, derived from our experience in administration of the Act, that conclusionary evidence of this nature is immaterial to issues such as those presented in this case." The Board argues that its statement relates merely to testimony that the employees formed and joined the plant union of their own free will and were not influenced, interfered with, or coerced by the Company; that this testimony was not material, because of positive evidence in the record that the Company had interfered with and assisted in the formation of the plant union, which rendered that organization incapable of acting as the bargaining agent of the employees.

It is our understanding that, when an employer is charged with an unfair labor practice which he denies having committed, the Constitution of the United States guarantees him a fair trial of the issue; that one of the requirements of a fair trial is that any evidence which is competent and material shall be received and considered, and that the strength of the testimony against him has no bearing upon the admissibility of his testimony or his right fully to present his defense. The rule contended for by the Board that the introduction of positive and direct evidence of guilt renders pertinent "conclusionary" evidence of innocence immaterial might make for expedition in the trial of controversies before the courts and administrative agencies, but it is not in accord with present basic ideas of fairness. If one were of the opinion that it appeared from the undisputed evidence in this record that the plant union was, as a matter of law, a company-dominated union and that all reasonable and fair-minded men could, from the evidence, reach no other conclusion, one might believe that the failure of the Board to consider what it terms "conclusionary" evidence, no matter how material, was harmless error. The Board, however, had the burden of proof; it was the sole judge of the facts, of the credibility of witnesses, and of the weight of their evidence. Unquestionably it could have found from the competent evidence introduced and proffered by the Company and the plant union that the latter was not company-dominated, or the Board could have determined that the evidence was insufficient to justify the conclusion that the plant union was company-dominated. It seems to us that the Company and the plant union are justified in contending that the evidence of the employees tending to show lack of domination and interference by the Company

"It is the Labor Board's duty only to show the acts of the employer are the type that interfered with, restrained or coerced; that if in this case, where the prior evidence shows the employer has interfered with, restrained and coerced certain employees, the fact they may provide many witnesses who think they were not interfered with, restrained or coerced has no bearing on whether other employees were interfered with, restrained or coerced.

"For a fourth reason, I think the question is improper because of the unreliability of introspective inquiries. By reason of the very nature of the subject matter, the employees who have been the subject of unfair labor practices really become so interfered with or dominated that they do not know their own minds, even assuming they were able to speak in the presence of the employer freely. It is our position they cannot speak freely in the presence of their employer, and if they have been, for long years, under the interference, restraint and coercion of their employer, their state of mind is one which they cannot provide a fair introspective account of their own state of mind, because the domination, interference and restraint which the Act presupposes goes to the coloring of the employee's point of view, so he cannot look into his own mind and state what his position would have been if he hadn't been subject to this economic power which has been exercised over him unfairly by the employer.

"For those four reasons it is my position that the line of inquiry here directed to whether or not an employee believes that he joined the Donnelly Garment Workers' Union of his own free will isn't a proper line of inquiry.

"I am aware that the Court has directed us to take that testimony, and I will not object further in this hearing, but I do wish the record to show my position on this line of questions."

received no different or greater consideration upon the second hearing than it did upon the first, and that it was disregarded in both hearings.

4. Refusal of evidence of conspiracy on the part of the International.

The contention is that the Company and the plant union were entitled to show that the International, at and prior to the time of the formation of the plant union, was engaged in an unlawful conspiracy to force the Company, by the use of fraud and violence, to compel its employees, regardless of their wishes, to join the International.

This Court, in its former opinion in this case, said (page 225 of 123 F.2d): "We are of the opinion that the Trial Examiner did not err in confining the issues to those which were tendered by the complaint filed by the Board. We are satisfied that the Board was not required to try the International for alleged conspiracy nor to try the charge that the Board had conspired or colluded with the International." This statement, we think, was based upon the theory that the clean hands doctrine was not necessarily applicable to proceedings before the Board, and that, while the Board might, if it saw fit, inquire whether it was being taken advantage of to further unlawful or unworthy activities of the complaining union, it was not compelled to do so. The case of National Labor Relations Board v. Indiana & Michigan Electric Co., 318 U.S. 9, 63 S.Ct. 394, 87 L.Ed. 579, decided January 18, 1943, deals with this same question. It was held in that case that, while the misconduct of the party making charges of unfair labor practices against an employer does not deprive the Board of jurisdiction to issue a complaint or conduct a proceeding, such misconduct may properly be considered by the Board in determining whether it should institute or continue a proceeding upon the charges, and that the Board properly may be required to receive evidence and make findings on that issue. The Supreme Court said (page 19 of 318 U.S., page 400 of 63 S.Ct.): "The Board might properly withhold or dismiss its own complaint if it should appear that the charge is so related to a course of violence and destruction, carried on for the purpose of coercing an employer to help herd its employees into the complaining union, as to constitute an abuse of the Board's process."

The Company and the plant union here have at all times contended that the International, by the use of fraud and violence, was endeavoring to force the Company to herd its employees into the International, and that the charges filed by the International with the Board were not filed in good faith, but for the purpose of influencing the result of an action for an injunction brought by the Company to prevent the International from carrying out its threats.[7] That the charges of misconduct made by the Company and the plant union against the International are not without substance is shown by the record. We think that if a further hearing were to be held, the application of the Company and the plant union to this Court for permission to adduce before the Board additional evidence of the alleged misconduct of the International should be granted.

5. Evidence as to events in 1934 and 1935.

The Board based its findings of hostility of the Company to outside unions upon evidence of events which preceded the enactment of the National Labor Relations Act. The Company and the plant union regarded such evidence as incompetent and immaterial, and objected to its introduction. It is true that an employer's attitude prior to the Act toward the unionization of his employees may be an unfair criterion by which to judge his subsequent attitude. No doubt, an employer is entitled to the benefit of the presumption that he intends to comply with the law. We see no reason, however, why the Board may not show what the labor situation was at a plant shortly prior to July 5, 1935, for whatever light that may throw upon subsequent events. It must be remembered that in this case the Board was contending that, prior to that date, the Loy-

---

[7] In this connection, see: Donnelly Garment Co. v. International Ladies' Garment Workers' Union, D.C.W.D.Mo., 20 F.Supp. 767; Donnelly Garment Co. v. International Ladies Garment Workers' Union, D.C., 21 F.Supp. 807; Donnelly Garment Co. v. International Ladies Garment Workers' Union, D.C., 23 F.Supp. 998; Donnelly Garment Workers' Union v. International Ladies Garment Workers' Union, 8 Cir., 99 F. 2d 309; International Ladies' Garment Workers' Union v. Donnelly Garment Co., 8 Cir., 119 F.2d 892, and 8 Cir., 121 F.2d 561; Donnelly Garment Co. v. Dubinsky, D.C.W.D.Mo., 55 F.Supp. 587, 590, 594.

alty League was formed for the purpose of resisting the International and that the plant union formed in 1937 was an outgrowth of or a substitute for the League.

It is argued that the Company and the plant union were not permitted to introduce evidence relative to these past events which the Board contended showed anti-union sentiment on the part of the Company. This argument appears to be based in part upon the refusal of the Trial Examiner, during both the first and the second hearing, to receive evidence relative to the methods which the International, from the beginning, was using in its efforts to organize the Company's employees, and in part upon the assertion that, during the second hearing, the Examiner, over the objection of the Company, permitted the Board to examine witnesses relative to events that occurred in 1935, but refused the same privilege to the Company. The testimony specifically referred to as having been improperly received, over objection, related to the Loyalty League, which, as already pointed out, the Board contended was an instrumentality of the Company to resist the International, and which the Company and the plant union asserted was a mere social organization. What motivated the formation of the League and what purpose it served were proper subjects of inquiry, and we think that the rulings of the Trial Examiner relative thereto did not deprive the Company or the plant union of a fair trial. On the second hearing, the Trial Examiner permitted Mrs. Reed, the President of the Company, to cover the entire field in her testimony, although he subsequently struck out so much of her evidence as related to matters subsequent to July 15, 1939. We think, however, that the Trial Examiner, in view of the importance which he ascribed to events preceding the enactment of the National Labor Relations Act, should have received evidence proffered by the Company on the second hearing to show the methods employed by the International to organize the employees of the Company and that the Company was not guilty of the charges of discriminatory treatment of its employees made by the International under the National Industrial Recovery Act. We should hesitate to rule that the Trial Examiner's failure in this regard amounted, alone, to a denial of due process, but if the Company's attitude toward outside unions prior to the National Labor Relations Act was to be regarded as a matter of controlling consequence, the Company should, we think, have been afforded a full and fair opportunity to prove that its attitude was not what the International asserted it to be.

6. The Trial Examiner's direction of the order of proof.

It would be a rare case in which the direction of the order of proof would be of sufficient consequence to amount to a denial of due process. The refusal of the Examiner to permit the Company to complete its examination of the witness Wave Tobin prior to putting on its employee testimony did not make the second hearing unfair. The order of proof is a matter addressed to the discretion of the trial tribunal. United States v. Manton, 2 Cir., 107 F.2d 834, 844.

7. Exclusion of competent and material evidence.

The Company and the plant union contend that, to refute the evidence relied upon by the Board and the International as indicating that the contracts with the plant union were a sham, evidence that contracts containing similar provisions were made by the International should not have been rejected. We know of no reason why evidence that provisions similar to those in the contracts between the Company and the plant union were not unusual and were included in contracts of the International itself should not have been considered pertinent. It at least bore upon the "imponderables" which the Board has the power to appraise. International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 79, 63 S.Ct. 83, 85 L.Ed. 50; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 599, 61 S.Ct. 358, 85 L.Ed. 368.

The Trial Examiner refused to receive evidence proffered by the Company (1) to show that, under the customs existing in labor unions and particularly in the International in the year 1937, instructors, head cutters, and head pattern makers or those holding equivalent positions, regardless of titles, were usually regarded as eligible to union membership and were received into such unions; (2) to show that Wave Tobin organized strikes in the Gernes, Gordon and Missouri Garment companies in Kansas City in March, 1937; that she, as agent and representative of the International, was in charge of and directed the strikes and the violence perpetrated in connection with them, and to show, by her, the nature of the violence and that it was intended that the

same methods should be employed against the Company and its employees; (3) to show, by the records of the Kansas City Joint Board of the International, that in the garment plants in Kansas City having contracts with the International, head cutters, head pattern makers, head examiners and instructors, whether known as such or not, are treated as eligible for union membership and are active members of the International, and that the eligibility and acceptance of such employees as union members is customary in the garment industry; (4) to show substantially similar facts by Erwin Feldman, counsel for garment companies which have contracts with the International.

The Company and the plant union, in support of their claim that the employees formed their own union in order to protect themselves against violence and misrepresentation and to prevent the Company, under threat of the destruction of its business and their jobs, from herding them into the International against their will, had a right to show what methods the International was resorting to in its organizing campaign in Kansas City. Such testimony would have substantiated the evidence of the employees that that was the reason they organized the plant union. The employees were interested witnesses whose testimony might be discounted. The testimony of those who conducted the strikes for the International could not well be disregarded. Most of the testimony relating to the alleged fraud and violence of the International is in the record in the form of offers of proof, but it was not received or considered by the Trial Examiner or by the Board.

The other offers of proof referred to, should not, we think, have been rejected. If the issues had been tried before a jury, evidence that employees holding positions similar to those of the employees who were asserted by the Board to be ineligible to union membership, were regarded by the International and other large unions as eligible to union membership, would, in our opinion, have been admissible. We do not mean that the jury would have been bound by such evidence, but that the evidence would tend to indicate that employees holding similar positions were not usually considered by employers and employees in the garment industry to be representatives of the management.

Our conclusion is that the Company and the plant union have not yet had the full and fair trial to which they are constitutionally entitled. It is apparent that the Board was convinced, upon the first hearing, that it had before it and had considered all of the competent and relevant evidence which it was required to receive and consider. It believes now that it has fully met the requirements of due process, has complied with the mandate of this Court, and is entitled to the enforcement of its order. We do not question the sincerity of the Board's belief. Courts and lawyers seldom differ as to what the requirements of due process are, but they not infrequently differ as to whether such requirements have been adequately met. (Compare, In re Noell, 8 Cir., 93 F.2d 5, 7. See, also Panhandle Eastern Pipe Line Co. v. Federal Power Commission, 8 Cir., 143 F.2d 488, 493-494.) In order to resolve this controversy over the question of due process, we think that the Board would be entirely justified in applying for certiorari. With that thought in mind, we have tried to give a fairly complete statement of the issues. The questions presented are of importance to the Board in the administration of the Act. They are also of importance to the Company, to the International, to the public, and particularly to the employees whose rights are involved.

We think that it would be inappropriate to consider the adequacy of the evidentiary basis for the Board's order at this time and upon this record. We have no right to assume that if the Board had received and considered all of the competent and material evidence proffered by the Company and the plant union, it would have made the same findings and order. We can not avoid the conclusion that, in the absence of the rejected testimony, the record presents an incomplete picture.

The prayer of the Board for a decree of this Court enforcing the order under review is denied for want of due process in the proceedings upon which the order is based.

RIDDICK, Circuit Judge (concurring).

This case is unusual among labor disputes. The employer, the Donnelly Garment Company, and all of its employees, approximately 1,200 in number, are now and have been since the beginning of this case aligned on the same side of the con-

troversy. This fact is of controlling significance in the settlement of the case.

In 1937, following the decision of the Supreme Court sustaining the constitutionality of the National Labor Relations Act, the employees of the Garment Company organized a plant union. The company recognized the union as the exclusive bargaining agent of its employees. The union and the company entered into a contract governing wages, hours of labor, and conditions of employment, which, for the five years passing between the formation of the union and the Board's order now before this court, has satisfactorily served the purpose for which it was intended. The ultimate question for decision is whether the plant union is the independent agency of the employees, freely organized and administered by them in their interest, or whether, as the Board found, it has its roots in a prohibited domination and coercion of employees by the company.

When the Board's charge of company domination of the plant union first came on for hearing before the Board, the union had been in existence for two years. The plant union was permitted to intervene in the hearing before the Board to contest the charge of company domination. It requested the Board to conduct a secret election to determine the question at issue. This request was denied by the Board for reasons which are not important here and which were no doubt sound. But, after the Board refused the requested election, there remained but one other means of determining the facts at issue before the Board—a hearing at which those who knew the facts might be permitted to testify concerning them. The Board after denying the employees the right to vote upon the question at issue also refused to let them testify. We held that this refusal constituted a denial of due process, and remanded the case to the Board in order that the rejected evidence as well as any other admissible and material evidence might be heard.

At the second hearing before the Board the company and the employees offered to prove by each of the persons then working for the company that the plant union had been organized and subsequently administered by employees alone, free from the coercion or control of the company, and that it was at the time of the hearing the agency freely chosen by each of them to represent them in collective bargaining with the company. The testimony of a relatively small number of employees was received. It conformed in all respects to the terms upon which it was offered. The examiner conducting the hearing refused to hear testimony of other employees on the ground that it was merely cumulative. This refusal is not subject to criticism, but implicit in it is the finding that each of the remaining employees would have testified to the same effect as those whose testimony was received. The situation in this case, therefore, is the same as if each and every employee had testified in denial of the charge of company domination of the plant union.

Unless this employee evidence is in some manner contradicted by other evidence in the record, the finding that the plant union was not the free agent of the employees is a denial of the employees' right of collective bargaining by the agency of their own choice, which the National Labor Relations Act guarantees and which it must be supposed this proceeding was instituted to protect. In my opinion, there is no substantial evidence tending to support the Board's finding.

At most, the evidence on which is based the Board's finding of company domination is sufficient to establish that at the time of the formation of the union there existed between the company and the International Union a spirit of active hostility, in which the employees of the company joined on the side of the company, and a long history of amicable relations between the company and its employees; and that the plant union was organized by the employees as a result of the attempt of the International Union to organize them and as a means of preventing that organization. There was neither any evidence, nor any finding by the Board, that any of the employees of the company had ever been disciplined or discharged by the company because of labor activities or affiliations. Membership of so-called supervisory employees originally permitted by the plant union had been terminated at the time of the hearing before the Board. Inconsequential use by officers of the plant union of the company's communication system and telephones and some office equipment had been the custom among the employees long before the organization of the plant union, and was quite evidently regarded by the company and the employees as of no sig-

nificance. Whatever degree of substantiality such evidence may have in other situations on the question of employer domination of a plant union, it is as a matter of law entitled to none when opposed by the employee testimony in this record. Whether the company or any of its employees, before the full reach of the National Labor Relations Act had been definitely determined, engaged in activities now recognized as a possible means of employee coercion, the fact that at the time of this hearing, five years after the organization of the plant union, the employees unanimously chose it as their agent for collective bargaining ought to control the issue in this case.

For more than seven years the employees have defended the plant union, at great expense to themselves, before every tribunal in which its integrity has been called in question. Throughout this period they have been fully advised of their rights under the National Labor Relations Act. There have been no defections from their ranks. None of them permitted to testify has been impeached on the witness stand. The credibility of none of them has been attacked. Five years after the organization of the plant union all of its members have testified to their deliberate choice of it as their agency for collective bargaining with their employer. In this situation there is no room, in my opinion, for the inference that these employees have been, and continue to be, the victims of an illegal coercion by means unknown to them and too subtle to be susceptible of proof, or for the inference that they have surrendered their right freely to choose their labor affiliation in return for the occasional inconsequential use of the Garment Company's telephones, mimeograph machines, and office facilities.

I think it clear beyond question that there was a denial of due process in the hearing before the Board, because of the Board's refusal to give any weight to some of the material evidence received, as well as because of its refusal to hear material evidence offered by the Garment Company and the plant union. This, of course, requires that the Board's petition for enforcement be denied. But the real issue in this case is whether there is in the record before us any substantial evidence to sustain the Board's order. In view of the long history of this case, I think the issue should be decided. There have been two

trials of this controversy before the Labor Board and before this court. It is quite certain that if upon a third trial the evidence which the Board rejected should be received, it could not weaken, if it failed to support, the case which the employees have made. The public interest requires that there should be an end to this controversy, and, in an effort to accomplish that desired result, I think this court should hold that there is no substantial evidence in the record before it to support the Board's order, and that, accordingly, the order should be set aside.

WOODROUGH, Circuit Judge (dissenting).

The decision here involves the application of the legislation that has been enacted by Congress to meet the great problem of labor disputes, and as I am not in agreement, the importance of the matter necessitates a brief statement.

Labor disputes within judicial knowledge have been a kind of warfare, costly in suffering and economic loss, and for a long time they were not justiciable. But the labor acts have now formulated into positive law definitions of certain rights of labor and certain few restrictions on the power of management over labor in industry that are deemed to have the weight of public opinion behind them and are declared by Congress to be conducive to industrial peace. By the provisions which are most relevant in this appeal, Congress has established that one of the most crucial of labor disputes, and the one that has long bred disorder, namely, the question of the affiliation of a plant's workers with the labor union of the trade at which they work, shall be determined by resort to the democratic process of elections.

There has never been, and is, no unanimously agreed on yardstick to settle whether unionism has caused or hindered the gains that have admittedly accrued to labor. The gains go to the workers in a shop equally, whether they affiliate with labor unions or oppose them, as there is no such thing in industry as a higher wage to a union worker as such. Though this advantage to a worker of a position where he may get the gains of union without the pains, is obvious to the dullest, and millions refuse to join the unions, the fact remains that other millions have joined up. In newer fields they are induced to do so by ways and means, fair and foul, that are now thor-

oughly well known. Since elections have been provided for, the term "electioneering" covers them all. The Labor Relations Board has been established with a main central purpose of determining the will of the workers in respect to such joining or not joining by the democratic process of free election by secret ballot. The Acts extend the democratic process and its incidents beyond the political into the economic field. In the old field, the democratic way is, and always has been, the hard way. In the new field, the character of the feelings aroused is the same and resistance is, as expected, no less formidable. But the democratic way prevails in the political field and Congress has enacted that it shall have its place also in the field of labor relations.

Despite the enormous volume of the record in this appeal, accumulating ten years' administrative and court proceedings between the same parties, the one single matter of substance involved in it is whether or not an election by secret ballot with concomitant electioneering shall be allowed for the workers in the Donnelly Garment Company's factory at Kansas City on the selection of a bargaining agency. The old established union of the garment workers, claiming that in the course of its existence it has lifted the condition of the workers in the industry from degradation to decency, and promising to continue the advance, has wanted to obtain affiliation of the workers in the Donnelly plant and has raised a labor dispute, and the Board has tried through the years to remove the obstacles to apply the democratic process of election to determine the dispute.

The Donnelly company has resisted, not because it has ever feared the result of an election, but it has feared the electioneering that goes with the democratic process of a free election. It has accordingly engaged, during the years, in measures to anticipate, suppress and prevent the electioneering which is included in the American concept of an election. It has succeeded through an injunction erroneously issued by a district judge (belatedly reversed), by discharge and dropping out of employees favoring union affiliation, by a slight wage increase, by company dominated union and closed shop contract made with it, and protracted court proceedings which include several decisions. The conclusions of the majority opinion in this proceeding refusing to enforce the Board's order to disestablish the plant union, in effect validates the contract that has been made by which any affiliation with the old union is forbidden to any of the workers in the plant during its continuance, collective bargaining is completely forestalled and avoided, and any practical opportunity or occasion for the application of the democratic process of an election at the plant has been anticipated and removed. The company has been, and is, proceeding in its competition within the unionized industry freed under judicial rulings from any impact upon its workers of the electioneering and secret ballot of the democratic process of election provided by Congress. It has so proceeded in a peace which is grateful but which is not, in my opinion, anchored in sound application of the Labor Acts.

On the first appeal of this particular proceeding (which is an inquiry upon a charge against the company of unfair labor practices) the company complained that the Board had refused to let it bring in and inquire of each and all of its twelve hundred workers individually touching his or her mental attitude for or against the established garment workers union and a plant union, and his or her reasons. It was the Board's position that it had no right or power to determine the will of the workers in a plant in such a manner or in any other way than through the election upon secret ballot prescribed for such determination by it in the statute of the Board's creation. This court held that the Board had denied due process in refusing to permit the inquisition of the individual employees.

If decision on that appeal had been conclusive of the controversies to be decided here, I would be bound to follow it under our discipline in the court, but it has not been. I did not sit with the division of this court which rendered decision, and consider it my duty to take this first opportunity to state my view that the Board was neither required to permit the inquisition of the workwomen, nor was it bound to give any special or particular weight to the answers they made to the interrogatories propounded to them on the subject in the presence of the company's representatives. I do not agree with the implication of the decision that the Board should have found the facts according to what the twelve employees answered, or the stipulation that the others would answer similarly if interrogated under the same surroundings.

In the thought of this country, voting a political preference includes casting the ballot in secret, and when the process is extended to the economic field the same element of secrecy necessarily goes with it. A procedure by which the will of any mass of people is determined by having either the political or the industrial bosses who are in control call in the individuals for questioning as to their will and having the answers so elicited recorded as determinative of that will, is futile and contrary to any American concept of a free election process.

It happens in this case that both the outstanding owner of the company herein and the great and famous spokesman for it,[1] had and deserved the highest honor, trust, respect and affection, and there may have been no single one of the workers in the plant without some obligation for some kindness personally bestowed. But the fact, indisputable as it is, does not detract from, it illuminates the principle involved in this case.

The American concept of free election includes the element of electioneering, as vitally essential a part of it as is the secret ballot. Indeed, the first is much older in the tradition than the second. The history of electioneering in the sense of attempting to win elections in the political field probably records every form of brutality, violence and fraud that the occidental mind conceives of. Yet in that field the democratic process stands. The gist of the long years of wordy controversy in this case is that the electioneering of the Ladies Garment Workers Union in a Donnelly plant election would be too terrible to be permitted. The supposed terror has been enlarged upon in every argument to the Board and to this court, as well as to the workers in the plant. The anticipated terror has been first erroneously enjoined and now forestalled and prevented by judicial decision.

There is no reason to believe that the Congress which enacted the labor laws thought that the democratic process which it introduced into the economic field would be immune from the impact of any of the clashing of interests and resultant passions, excitements and incidents attendant on its practice in the political field. The element of electioneering will continue to inhere as a vital and vitalizing element.

But there is no power in the courts to prevent political elections because the electioneering will involve excitement and violent clashing. The labor acts have similarly forbidden the courts to try to use the judicial powers of prevention against the working out of the democratic process in the economic field into which Congress has extended it.

Here the forbidden result has been attained and the judicial preventive keeps any electioneering from being done and any election from being held because the form into which the proceedings have been cast opened the door to it. The court would never have ordered an election which it identified as an election to be determined by letting the bosses interrogate the voters individually and recording the answers as votes. I am satisfied that the thing cannot and should not be done under any form.

My study of the record herein has satisfied me that the findings of the Board herein are sustained by substantial evidence. They are clear and unambiguous and set out the several steps by which the company anticipated and has prevented any kind of an attempt by the established garment workers labor union to obtain the affiliation of the workers in the company plant. It appears to me that the methods by which the company fostered and set up and now maintains its plant union, including all its workers, present and prospective, and binding them against other affiliation, as well as precluding any collective bargaining, are the same methods that have been consistently held by the courts to be contrary to the Act. When, as it is said, the established union arrogantly demanded of the company that it herd the women and girls who worked for it into the union, nobody doubted that the company could easily have done so. The form of the company's charge that the union members conspired to force the company to herd its workers into the union directly implies that the company could have done so. Or it could proceed to herd the employees into a company union with no means or power of collective bargaining. Or it could have left them to get together away from their bosses to consider and to exercise a free choice. The company went as far from leaving them to a free choice as it did from herding them into the union affiliation demanded. Its agents held out

---

[1] The late Honorable James A. Reed of Missouri.

to and regarded by the workwomen as their bosses, acting with and for the management, used company facilities and the power and authority of the employer to gather all of the personnel in a hall on the plant property, and then and there directed and consummated the organization of the plant union. The women and girl workers acquiesced, as the established discipline of the business and the accustomed submission to the authority of the supervisors over them rendered it practically certain that they would. There was no interval between the time they checked in for work at their machines (i.e., reported themselves for orders and direction) and the time when they signified their adherence to a plant union when it could fairly be said that they were released from the factory discipline or the authority of the company agents who maintained that discipline over them. The prima facie evidence was clearly sufficient to support the charge of domination, and without disproof could justify no other inference than that the company did by unfair labor practices set up and herd its workers into the pseudo plant union in order to forestall and prevent any electioneering for union affiliation.

Instead of attempting to disprove that showing, it appears to me that the company proffered testimony that tended merely to divert the inquiry away from it and it does not appear to me that the Board denied the company or the pseudo plant union due process of law by excluding such proffered testimony. The repeated offers to bring in all the working women and girls to testify individually merely illustrates what appears to me to have been the tendency of the company's proffers to divert the trial from the charges. There happened to be only twelve hundred of the workers in the particular plant, but in shops that employ many thousands it is obvious that the lifetime of an Examiner would be too short. The offers to prove what the electioneering conduct of the established garment workers union had been before the company herded its workers together into the company union is of the same nature. That there was fear of the union seems to me as irrelevant to the charges against the company as is the history of the origin of such fear. As to that also, the history of the union is too long, and the lifetime of an Examiner would be too short. It seems to me that the inquiry demanded in the proposed fields of controversy would only protract and distract. It could not illuminate. Employers may not commit the unfair labor practices such as charged in this case to prevent union electioneering even by labor unions that have a bad record behind them. There was no showing here, as in the Indiana & Michigan Electric Co. case (318 U.S. 9, 63 S.Ct. 394, 87 L.Ed. 579), that the labor union was resorting to violence and acts of terrorism adapted and intended to affect the trial and inquiry of the Board then pending. Nor does the offer to prove that the supervising agents of the company, who effected the organization of its plant union, had the same rank in the Donnelly company as some of the members of the established union have in other companies, appear to me to be relevant. The question whether they acted for management and bound the company by their acts was controlling. There were also offers to prove that the labor union claimed and promised better wages and working conditions and that the representation was false in that the company under its system did and would do better by its workers than union shops. I think the issue so tendered is not justiciable, either by the Board or by the courts. The question of sanctioning or suppressing labor unions is political and is debated by millions. To the extent that it is settled by the Labor Acts, the courts are bound. It is not within the power of the courts, by taking one side or the other at the instance of a private litigant, to settle whether the patriarchal or the labor union system does better for working people in the garment making industry or in any or all of the industries. The process of election under secret ballot is alone appropriate to that quarrel.

Neither do I find evidence of bias or prejudice to disqualify the Examiner in this case. He seems to me to have ruled in accord with the dictates of his conscience and to have endeavored, against great resistance, to keep the trial within a rational relation to the charges to be tried. The multiplied offers to enter into unlimited remote controversial fields of inquiry suggested means to prolong the hearing to the point of frustration, but not, as it seems to me, to a fairer decision on the charges being tried.

In my opinion the order based upon the Board's findings and conclusions (reported 50 N.L.R.B. 241) should be enforced as prayed.